# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

United States of America,

        Plaintiff,

v.

Arthur James Chappell, also known as
AJ, also known as J,

        Defendant.

Crim. No. 09-139 (JNE/JJK)

**REPORT AND
RECOMMENDATION**

Erica R. Mozangue, Esq., Assistant United States Attorney, counsel for Plaintiff.

Caroline Durham, Esq., Assistant Federal Defender, counsel for Defendant.

JEFFREY J. KEYES, United States Magistrate Judge

        This matter is before the Court on Defendant Arthur James Chappell's

Pretrial Motion to Dismiss [the] Indictment for Failure to State an Offense (Doc.

No. 23), Motion to Suppress Evidence Obtained as a Result of Search and

Seizure (Doc. No. 28), and Motion to Suppress Statements, Admissions, and

Answers (Doc. No. 29). The motions have been referred to this Court for a

Report and Recommendation pursuant to 28 U.S.C. § 636 and Dist. Minn. Loc.

R. 72.1. This Court held a hearing on the motions on October 13, 2009,[1] and

received testimony from the following two witnesses: City of Bloomington Police

---

[1]     This Court is simultaneously releasing an Order dealing with several non-dispositive motions heard at the October 13, 2009 hearing.

Officers Judson Broen and Brian Smith. This Court received nine exhibits from the Government, including search warrants and supporting affidavits, as well as a recording of a June 22, 2007 police interview with Defendant. For the reasons stated below, this Court recommends that Defendant's Motion to Dismiss Indictment for Failure to State an Offense be denied, Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure be denied, and Defendant's Motion to Suppress Statements, Admissions, and Answers be denied.

## BACKGROUND

Defendant Arthur James Chappell is charged with one count of sex trafficking of a minor in violation of 18 U.S.C. § 1591. (Doc. No. 1.) Defendant seeks to dismiss the Indictment for failure to allege conduct meeting the constitutional requirements necessary to fall within federal jurisdiction. Defendant's motions to suppress evidence and suppress statements involve: information obtained from law-enforcement surveillance of Defendant; information obtained during an inventory search of a vehicle Defendant had driven; information obtained during the booking process following his arrest—including evidence gathered from a cellular phone found on his person; statements he made during a police interview conducted after his arrest; and evidence gathered in the execution of several search warrants.

**I. Investigation of Defendant's Suspected Promotion of Prostitution by City of Bloomington Police Department**

At the October 13, 2009 hearing, City of Bloomington Police Officer Judson Broen, who is an investigator with the City of Bloomington Police Department's vice unit, testified regarding his investigation in this case. (Doc. No. 41, Tr. of Proceedings ("Tr.") 5.) Officer Broen first learned about Defendant's involvement in the promotion of prostitution shortly after September 2006. (Gov't's Ex. 2 at 2.) At that time, Broen learned that Defendant was associated with an individual named Suzanne Oliver who was involved in the promotion of prostitution. (*Id.*) During a search of a vehicle that officers impounded after arresting Oliver, they found "wire transfer receipts totaling thousands of dollars, some of which had [Defendant's name] on them, as well as FedEx receipts for packages sent to [Defendant.]" (*Id.*) When the officers later searched a location in Burnsville in connection with their investigation of Oliver, they recovered paperwork and mail in Defendant's name. (*Id.*)

Just before June 15, 2007, Officer Broen received more information regarding Defendant's alleged involvement in the promotion of prostitution. (Tr. 6.) He received this information from a Bloomington patrol officer, who had in turn obtained the information from management and front-desk clerks at a Bloomington hotel, the Homewood Suites. (*Id.*) Specifically, these sources stated that Defendant had rented a room at the Homewood Suites and they had observed a high volume of foot traffic into and out of Defendant's rented hotel

room.  (*Id.* at 6-7.)  The hotel manager and front-desk staff also observed that Defendant was frequently at the hotel with several women who they suspected were engaging in prostitution.  (*Id.* at 7.)  They had observed Defendant and these women going to and from the hotel in a large, silver sport-utility vehicle and Defendant taking money from some of the suspected prostitutes.  (*Id.*)  The patrol officer also provided Officer Broen with photographs that had been taken from various websites believed to be promoting prostitution, and these photographs showed women "in varying stages of clothing, provocative and erotic poses, and describing location dollar amounts."  (*Id.*)  These photographs depicted two of the women that the hotel employees had seen in the hotel.  (*Id.*)  Apparently, Broen later confirmed some information on the websites himself.  (*See* Tr. 10 (discussing "things [Broen] observed online [him]self").)

Based on the information provided by the patrol officer and the hotel employees, Broen decided to conduct surveillance at the Homewood Suites.  (Tr. 8.)  On June 20, 2007, he conducted this surveillance from an unmarked police vehicle positioned in a parking lot shared by the Homewood Suites, another hotel, and a restaurant.  (*Id.* at 25.)  Broen was positioned about 25 yards from the entrance at the front of the Homewood Suites hotel and another side entrance on the southwest side of that building.  (*Id.* at 25-26.)  He observed a silver Dodge Durango sport-utility vehicle arrive on the south side of the Homewood Suites building, and saw three females exit the vehicle and enter the building.  (*Id.* at 9, 26.)  He recognized several of these women from photographs

4

he had seen on the websites he believed to be promoting prostitution.  (*Id.* at 9.)

Broen said that he did not know with certainty at that time why these women

were at the hotel, to what room in the hotel these women were going, what their

legal names were, or whether they had any criminal background.  (*Id.* at 26-27.)

When the Durango pulled away from the building, Officer Broen attempted

to ascertain who the driver of the vehicle was by following the Durango in his

unmarked police vehicle.  (Tr. 9.)  Broen eventually confirmed that Defendant

was the driver by pulling alongside the vehicle, and he was able to confirm that

Defendant was the driver of the vehicle because he had previously seen photos

of Defendant between June 15, 2007, and June 20, 2007.  (*Id.*)  As he confirmed

that Defendant was the driver of the silver Durango, Broen noticed that there was

a woman in its passenger seat as well, but he did not recognize her.  (*See id.* at

10, 28.)

Officer Broen believed he had probable cause to stop the Durango and

arrest Defendant for promoting prostitution based on previous information about

Defendant dating back to 2006, the information he received from the patrol officer

and hotel employees, his own investigation of the websites, and his observations

at the Homewood Suites hotel.  (Tr. 10.)  Broen contacted a patrol car to assist in

the stop of the Durango, and when the patrol car arrived, the sergeant driving the

patrol car assisted in the stop and the arrest of both Defendant and the female

passenger.  (*Id.*)

As Defendant and the passenger were being taken to jail, law-enforcement officers on the scene decided to impound the Durango, which was a rental vehicle.  (*See* Tr. 10, 31-32.)  Officer Bitney, who had arrived at the scene of the stop of the Durango, conducted an inventory search of Defendant's vehicle after it had been impounded.  (*Id.* at 32.)  Pursuant to a Bloomington Police Department policy, officers conduct an inventory search of any vehicle the Department impounds for the purpose of ensuring the safety of the officers, to secure any property that may be inside the vehicle belonging to its owner or operator, and to protect the Department from liability.  (*Id.* at 10-11.)  Officer Broen informed Officer Bitney prior to the inventory search what the reason was for Defendant's arrest.  (*Id.* at 32.)  Officer Broen admitted that the focus of the items inventoried during the search of the Durango were items related to prostitution.[2]  (*Id.*)  Although Officer Bitney inventoried the vast majority of items in the Durango, the only items listed on the inventory form, including for example a cellular phone and various receipts, were those related to the possible prostitution crimes.  (*Id.* at 32-33.)

---

[2]     Following the hearing, this Court requested that the Government provide the Court with any forms relating to the search of the Durango.  The Government provided these forms and a report prepared by Officer Bitney to this Court.  (*See* Appendix A, a copy of the inventory form, attached to this Report and Recommendation.)  The inventory form lists the items seized in the search of the Durango and confirms Officer Broen's testimony that all the items inventoried from the vehicle relate to Defendant's suspected offense of promoting prostitution.  These documents also show that each item inventoried, except perhaps a cellular phone found in the Durango, apparently has a value under 50 dollars.

As the Durango was being impounded, Defendant and the female passenger were taken to the Bloomington jail.[3] (Tr. 11.) Officers "booked" Defendant when he arrived. (*Id.*) The booking process involves fingerprinting, routine booking questions for the purpose of confirming identity, and an inventory of any property taken from the arrested individual. (*Id.* at 11-12.) The purpose of this process is to ensure safety, to protect the Department from liability, and to ensure that the arrested person possesses no contraband. (*Id.* at 13.) As part of this booking process, the booking officers took all items in Defendant's possession. (*Id.* at 12-13.) The property taken from Defendant's booking included a wallet, a cellular phone, and various forms of identification, including at least one credit card. (*See id.* at 13.) A credit card found in Defendant's wallet had been used to rent the room at the Homewood Suites hotel in Bloomington that Officer Broen suspected was being used in Defendant's promotion of prostitution. (*See id.*) Officer Broen looked through Defendant's wallet during the booking procedure to advance his investigation and to "complet[e] a thorough search of the wallet." (*Id.* at 35.) Among the items that Officer Broen later used in his investigation from the inventory search of the wallet were the numbers from various credit cards he found. (*Id.* at 36.)

Immediately after Defendant entered the booking facility, Officer Broen and another officer examined the cellular phone that had been taken from

---

[3]     The female passenger was held and released later that same day.

Defendant's person, particularly the phone's list of recent calls and recent text messages. (Tr. 15.) Broen did not have a warrant authorizing him to look through the phone, but it was his understanding that he could inspect anything on the cellular phone without a warrant until the completion of the booking process, so he stopped examining its contents when the booking process was completed. (*Id.*) He also stated that he believed he was required to get a search warrant to look for information on the phone after the booking process was finished. (*Id.* at 15-16.) Officer Broen added that he was hoping his inspection of the cellular phone's recent calls, texts, and directory during the booking process would further his investigation. (*Id.* at 34-35.) Since he believed that he had to stop examining the cell phone's directory and text messages when the booking process was finished, Broen did not have enough time to finish his investigation of the cell phone. (*Id.* at 15, 34-35.) He later obtained a search warrant to gather information from this cellular phone and another cellular phone found in the Durango. (*Id.* at 15; Gov't's Ex. 8.)

At some point during the booking process, but not in response to any question asked by law-enforcement officials, Defendant asked Officer Broen if he would be going to the room Defendant had rented at the Homewood Suites hotel. (Tr. 14.) Officer Broen stated that he responded to Defendant by saying "Maybe." (*Id.*) At that point, Defendant asked Officer Broen to "be nice" if, in fact, he went to the hotel room because Defendant would "have to pay for any damage" done to the room. (*Id.*)

On June 22, 2007, two days after the arrest and booking of Defendant were completed, he was released from jail. (Tr. 16.) However, shortly before Defendant's release, Officer Broen and another officer named Dustin Stendel interviewed Defendant. (*Id.* at 17, 19; Gov't's Ex. 9.) The officers recorded the interview, which took place in a room approximately ten feet by twelve feet that had one table with three chairs pushed up against a wall. (Tr. 17-18, 19.) Officers Broen and Stendl both wore jeans and T-shirts during the interview, and neither carried a gun. (*Id.* at 19.) Officer Broen stated that neither he nor Officer Stendl made any threats or promises to Defendant during the interview. (*Id.* at 19-20.) Officer Broen also testified that no law-enforcement official had conversation with Defendant during his transport between his jail cell and the interview room either before or after the interview. (*Id.* at 21.)

At the beginning of the interview, Officer Broen told Defendant why he had been arrested and informed him of his *Miranda* rights, reading the *Miranda* warnings from a card issued by the Minnesota Police and Peace Officers Association. (Tr. 18.) Defendant informed Officers Broen and Stendl that he wished to speak to them without a lawyer present. (*Id.* at 19.) Defendant never asked for an attorney during the interview, never asked to stop speaking with the officers, and that the interview had the tone of a "fairly low-key conversation." (*Id.* at 20.) Officer Broen ended the interview when he and Officer Stendel concluded that it was not productive. (*Id.* at 21.)

Officer Broen testified that it is his understanding that when someone is arrested by his police department on probable cause for promotion of prostitution, that person can be held for only 36 hours without formal charges being filed. (Tr. 29.) He explained that after the 36 hours has passed, the arrestee must be released if charges have not been brought. (*Id.*) At one point in the interview, Defendant asked one of the officers, "Am I still on a PC hold or have I been charged?" That officer explained that Defendant was still being held for probable cause without formal charges yet being filed. (Gov't's Ex. 9, DVD Recording of June 22, 2007 Interview ("Interview DVD") 4:28-4:33.) Near the end of the interview, Defendant stated that he understood that he would have to be released soon because his 36-hour window was ending around 12 o'clock, and one of the officers responded that they could continue to hold Defendant if they got "an extension" (*Id.* at 36:01-36:08), but Officer Broen testified that he did not recall telling Defendant that the 36-hour deadline for Defendant's release could be extended. (Tr. 29.) The interview lasted just over 36 minutes. (Interview DVD.)

Defendant was released shortly after the interview on June 22, 2007. (Tr. 16, 29.) At the October 13, 2009 hearing, the head of the vice unit for the Bloomington Police Department, Sergeant Brian W. Smith, testified that he and other Bloomington Police Department personnel followed Defendant when he left the jail to find out who picked him up and where he was going. (*Id.* at 49.) Defendant left the jail on foot. Some officers followed him on foot while others

followed him in unmarked vehicles.  (*Id.* at 50.)  They followed Defendant to the east parking ramp at the Mall of America, where he got into a 2007 Mitsubishi Gallant with two females.  The car was loaned to Defendant by a car dealer.  (*Id.* at 50-51.)  Sergeant Smith observed Defendant get into the driver's seat of the vehicle and drive the car out of the parking ramp.  (*Id.* at 50.)  Sergeant Smith was aware, at that time, that Defendant had a suspended license.  (*Id.*)

Sergeant Smith and the other officers followed Defendant in an unmarked police car south out of Bloomington toward an area in Burnsville where they suspected Defendant intended to go.  (Tr. 50.)  At some point, they believed that Defendant became aware of their presence because he started driving "erratically," which Sergeant Smith described as involving a high rate of speed for a continued period of time and weaving in and out of traffic.  (*Id.*)  Sergeant Smith and the other officers then called for squad cars in the Burnsville area to assist them with stopping Defendant's vehicle because the Bloomington officers were in unmarked cars.  (*Id.* at 50-51.)  Burnsville area squad cars assisted in the stop and Defendant was arrested for driving while his driver's license was suspended and for reckless driving.[4]  (*Id.*)  The Mitsubishi was impounded, inventoried, and eventually towed to the dealership that had loaned it to Defendant.  (*Id.* at 52-53.)

---

[4]     Sergeant Smith testified that Bloomington officers drove the two female passengers away from the scene and conducted interviews with each of them.  (Tr. 54.)

Among the items taken from the Mitsubishi in the inventory of the vehicle were three cellular phones. (*See* Gov't's Ex. 7 at 2.)

## II.  Bloomington Police Officers Obtain and Execute Search Warrants

Bloomington police eventually obtained and executed eight separate search warrants for various residences, a local newspaper, bank records, and Defendant's cellular phones. (Gov't's Exs. 1-8.)  Statements made in the affidavits supporting the applications for two of these search warrants present issues regarding the affiants' representations about the location of Defendant's residence.  The first of these search warrants was obtained and executed on June 21, 2007, at an address on Parkwood Drive in Burnsville, Minnesota, that Bloomington police believed to be Defendant's residence. (Tr. 16; Gov't's Ex. 1.) In the affidavit supporting the application for this search warrant, Sergeant Smith stated that "[a]t the time of his booking, [Defendant] provided officers with the address of XXXXX Parkwood Drive in Burnsville." (Gov't's Ex. 1 at 2.) Defendant, however, provided a Texas address one at the start of the interview with Officers Broen and Stendel on June 22, 2007. (*See* Tr. 39.)

On July 2, 2007, Officer Broen obtained a search warrant for another address located on Taylor Street in Minneapolis, Minnesota, based on an application and an affidavit that were similar to Officer Smith's application for the Parkwood Drive warrant. (Gov't's Ex. 2.)  However, this later affidavit did not specifically inform the magistrate that officers had previously represented the

Parkwood Drive address to be Defendant's residence in securing a warrant for that location.

**DISCUSSION**

### I. Motion to Dismiss Indictment

As noted above, Defendant has filed a Pretrial Motion to Dismiss [the] Indictment for Failure to State an Offense (Doc. No. 23).[5]  Defendant challenges the indictment on the ground that the act alleged to be a violation of 18 U.S.C. § 1591 fails to meet the constitutional requirements (i.e., that the acts alleged do not affect interstate commerce) necessary to trigger federal jurisdiction.  (*Id.*) Section 1591 imposes punishment on anyone who "knowingly in or affecting interstate commerce or foreign commerce, . . . recruits, entices, harbors, transports, provides, or obtains by any means a person . . . knowing . . . that the person has not attained the age of 18 years and will be caused to engage in a commercial sex act."  18 U.S.C. § 1591(a)(1).[6]

---

[5]     Before Defendant obtained counsel in this matter, he filed a similar motion *pro se*.  (Doc. No. 3.)  As explained by Defendant's counsel on the record at the October 13, 2009 hearing, the later-filed motion to dismiss the indictment (Doc. No. 23), "encompasses" Defendant's *pro se* motion.

[6]     "[T]he starting place of any analysis of a motion to dismiss is that the allegations of the Indictment should be accepted as true."  *United States v. Patton*, Cr. No. 09-43 (PAM/JSM), 2009 WL 1514502, at *1 (D. Minn. June 1, 2009); *see also United States v. Winningham*, 953 F. Supp. 1068, 1075 (D. Minn. 1996) (noting that the district court must accept allegations in the complaint as true for the purposes of considering a motion to dismiss the indictment).  The Indictment alleges that from about May 2007 to around July 3, 2007, in Minnesota and elsewhere, Defendant "in and affecting interstate commerce, knowingly recruited, enticed, harbored, transported, provided, and obtained by
(Footnote Continued on Following Page)

In considering a motion to dismiss on the ground that the act alleged does not affect interstate commerce, this court is guided by the principle that Congress may regulate three categories of interstate commerce: "(1) 'the use of the channels of interstate commerce'; (2) 'the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities'; and (3) 'those activities having a substantial relation to interstate commerce.'" *United States v. Howell*, 552 F.3d 709, 714 (8th Cir. 2009) (quoting *United State v. Lopez*, 514 U.S. 549, 558-59 (1995)). In determining whether Congress has the power to enact a statute under the third category,[7] the Eighth Circuit has identified the following four factors:

(1) whether the regulated activity is economic in nature; (2) whether the statute contains an express jurisdictional element which limits its application to activities with "an explicit connection with or effect on interstate commerce"; (3) whether there are congressional findings about the regulated activity's effects on interstate commerce; and (4) whether the connection between the activity and a substantial effect on interstate commerce is attenuated.

---

(Footnote Continued from Previous Page)
any means a person, namely C, . . . knowing that force, fraud, and coercion would be used to cause C to engage in a commercial sex act and knowing that C had not attained the age of 18[.]" (Doc. No. 1 (emphasis added).)

[7] Here, Defendant has presented only summary argument regarding the motion to dismiss (see Doc. No. 45, Def.'s Mem. in Supp. of Pretrial Mots. ("Def.'s Mem.") 27-28), and the Government has addressed only the third category of Congress's commerce-clause power in its response to the motion. (*See* Doc. No. 50, Gov't's Post-Hr'g Resp. to Def.'s Pretrial Mots. ("Gov't's Resp.") 17-21.) Because the only argument before this Court pertains to the third category of Congress's power, this Court limits its discussion accordingly.

*United States v. Mugan*, 441 F.3d 622, 627-28 (8th Cir. 2006) (quoting *United States v. Morrison*, 529 U.S. 598, 610-13 (2000)). Several courts have concluded that § 1591 satisfies each of these four factors. *See, e.g., United States v. Evans*, 476 F.3d 1176, 1179 (11th Cir. 2007); *United States v. Paris*, No 03:05-CR-64 (CFD), 2007 WL 3124724, at *7-8 (D. Conn. Oct. 24, 2007);

This Court agrees. First, the regulated activity alleged here is the promotion of a minor's involvement in commercial sex acts, which is unquestionably economic in nature. Second, the statute at issue contains an express jurisdictional element because it requires the jury to find that the regulated activity has a connection with or effect on interstate commerce. Third, in enacting the Trafficking Victims Protection Act, Congress found that "Trafficking in persons substantially affects interstate and foreign commerce." 22 U.S.C. § 7101(b)(12). Concerning the fourth factor, the Government represents that in discovery it has provided Defendant with a two-page report detailing the connection between Defendant's alleged sex trafficking of the minor involved in this matter and interstate commerce. According to the Government, this report demonstrates (1) that Defendant had the minor perform commercial sex acts in rooms he rented at the Homewood Suites hotel, which is part of a larger hotel chain operated outside the State of Minnesota; (2) that Defendant used internet sites to promote the trafficking of the minor; (3) that Defendant used cellular telephones from a Virginia based company to promote the sex trafficking of the

minor; (4) that Defendant rented hotel rooms using a credit card from an out-of-state company; and (5) that Defendant purchased clothing for the minor at a store in the Mall of America that is part of a company based in California. Defendant has not disputed any of these allegations. Therefore, this Court concludes that § 1591 satisfies the four-prong test for determining whether an activity has a substantial effect on interstate commerce.

Defendant argues that the Supreme Court's decision in *Lopez* requires there to be "an impact on interstate commerce that far exceeds that present in this case." (Def.'s Mem. 28.) However, this Court agrees with the Eleventh Circuit's reasoning in *Evans* that the Trafficking Victims Protection Act "is part of a comprehensive regulatory scheme [that] criminalizes and attempts to prevent slavery, involuntary servitude, and human trafficking for commercial gain." 476 F.3d at 1179. As the *Evans* court observed, "Congress recognized that human trafficking, particularly of women and children in the sex industry, is a modern form of slavery . . . [and] found that trafficking of persons has an aggregate economic impact on interstate and foreign commerce." *Id.* (internal quotations and citations omitted). Here, the Indictment alleges, and this Court must accept as true, that Defendant promoted the prostitution of a minor "in and affecting interstate commerce." (Doc. No. 1.) Even if this allegation is taken to mean that Defendant's conduct was purely local to Minnesota, his activities "contribute to the market that Congress's comprehensive scheme seeks to stop." *Evans*, 476 F.3d at 1179 (internal quotations and alterations omitted).

Therefore, this Court recommends that Defendant's Pretrial Motion to Dismiss [the] Indictment for Failure to State an Offense (Doc. No. 23), and Defendant's *pro se* Motion to Dismiss (Doc. No. 3), be denied.

## II.    Motion to Suppress Evidence

Defendant filed a Motion to Suppress Evidence Obtained as a Result of Search and Seizure (Doc. No. 28).  In Defendant's post-hearing memorandum, he raises challenges to several aspects of the investigation and methods of obtaining evidence that law enforcement used in this case, including that: (1) police lacked probable cause to arrest him on June 20, 2007, for the promotion of prostitution, and they unlawfully arrested him a second time on June 22, 2007; (2) both the impoundment and inventory search of the Dodge Durango on June 20, 2007, were unlawful; (3) the search of his wallet and cell phone during the booking process on June 20, 2007, were unlawful; (4) the derivative evidence obtained through the execution of several search warrants should be suppressed as fruit of earlier unconstitutional searches; and (5) the affidavits supporting certain search warrants police obtained contain material falsehoods. Defendant also argues that all the evidence seized in this case must be excluded from trial because it is tainted by the unlawful nature of his arrest and prior searches.

### A.    Probable Cause for the June 20, 2007 Arrest

Defendant first argues that his arrest for promotion of prostitution on June 20, 2007, was not supported by probable cause and that all the evidence seized

thereafter must be suppressed because of this unlawful arrest.  When a police officer has probable cause to believe that a person has committed a felony, a warrantless arrest is permitted.  *See United States v. Travis*, 993 F.2d 1316, 1323 (8th Cir. 1993).  "An officer has probable cause to make a warrantless arrest when the facts and circumstances are sufficient to lead a reasonable person to believe that the defendant has committed or is committing an offense." *United States v. Torres-Lona*, 491 F.3d 750, 755-56 (8th Cir. 2007) (citing *Beck v. Ohio*, 379 U.S. 89, 91 (1964)).  "[P]robable cause requires only a probability or substantial chance of criminal activity, rather than an actual showing of criminal activity[.]"  *United States v. Mendoza*, 421 F.3d 663, 667 (8th Cir. 2005).  "'The determination of whether probable cause exists must not rest on isolated facts; rather it depends on the cumulative effects of the facts in the totality of circumstances.'"  *Tokar v. Bowersox*, 198 F.3d 1039, 1046-47 (8th Cir. 1999) (quoting *United States v. Everroad*, 704 F.2d 403, 406 (8th Cir. 1983)).

Defendant argues that the information Officer Broen had was "scant and unsupported by observation or confirmation" and that he based his investigation on "stale, uncorroborated reports of untested informants."  (Def.'s Mem. 8-9.) This Court disagrees.  At the time of Defendant's arrest on June 20, 2007, Officer Broen knew that Defendant had rented a room at the Homewood Suites hotel and that he had been seen frequently at the hotel with several different women who were advertising services on web sites commonly used for prostitution activities.  A patrol officer later confirmed that the web-site postings for these

women were active.  Hotel employees also informed the officers that there had been a high degree of foot traffic to and from the hotel room rented by Defendant and that Defendant drove back and forth to the hotel in a large, silver sport-utility vehicle.  The hotel employees also informed the officers that they had seen Defendant accepting money from some of the women they suspected of being prostitutes.  After receiving this information, Officer Broen set up surveillance at the hotel on June 20, 2007.  That day he saw a large, silver sport-utility vehicle, a Dodge Durango, pull up to the Homewood Suites and drop off several women, two of whom Officer Broen recognized from photographs posted on the web sites referenced above.  He followed the Dodge Durango, confirmed that Defendant was the driver, and called to have a patrol officer in a squad car stop the vehicle.

Defendant argues that, in fact, Officer Broen admitted that he did not have any information about why Defendant dropped off the three women at the Homewood Suites on June 20, 2007, and as a result, Officer Broen "arrived on a whim [and] arrested on a desire."  (Doc. No. 53, Def.'s Supplemental Br. in Supp. of Mots. to Suppress ("Def.'s Reply") 2.)  To support this argument, Defendant excerpts the following exchange from the October 13, 2009 hearing in which defense counsel questioned Officer Broen about what he knew of the women who Defendant dropped off at the Homewood Suites:

> Q.    The women who entered the Homewood Hotel, while you may have believed you knew street names for them, you didn't have any other information about them; true?
>
> A.    Correct.

Q.     Didn't know why they were there.

A.     Nope.

Q.     What they were doing.

A.     Nope.

Q.     If they were going to visit friends or what the situation was; true?

A.     No idea.

(Tr. 46.)  Although an isolated reading of Officer Broen's responses to defense counsel's skilled questioning may suggest that he knew virtually nothing about the purpose of Defendant's presence at the Homewood Suites hotel that day, this Court does not reach its "determination of whether probable cause exists . . . on isolated facts" but considers the "cumulative effects of the facts in the totality of circumstances.'"  *Tokar*, 198 F.3d at 1046-47.  When looking at the cumulative effects of the facts summarized above, this Court is left with a very different picture of what Officer Broen knew when he observed Defendant drop off several women at the Homewood Suites.  Officer Broen identified a silver sport-utility vehicle drop off three women he recognized from his investigation of photographs on reputed prostitution-soliciting web sites.  These women were the same women whom hotel employees identified as being suspected of prostitution and connected to Defendant and the room he rented at their hotel.  Thus, viewing the evidence's cumulative effects, this Court finds that Officer Broen had a reasonable basis to believe that Defendant had dropped off the women he left

Homewood Suites for the purpose of their using Defendant's rented room for prostitution.

Thus, this Court concludes that there was probable cause to support Defendant's June 20, 2007 arrest. Under Minnesota law, promotion of prostitution is a felony for which a warrantless arrest can be made. *See* Minn. Stat. § 609.322, subd. 1a(2) (providing for penalties of up to 15 years imprisonment for any individual who promotes the prostitution of another); Minn. Stat. § 609.02, subd. 2 (defining "felony" as "a crime for which a sentence of imprisonment for more than one year may be imposed"). The information available to Officer Broen at the time Defendant was arrested created a "substantial chance," *see Mendoza*, 421 F.3d at 667, that Defendant provided facilities within his control to aid in the prostitution of the women he was transporting to and from the Homewood Suites hotel. *See* Minn. Stat. § 609.321, subd. 7(2) (defining "promotes the prostitution of an individual" as circumstances in which a person "provides, leases or otherwise permits premises or facilities owned or controlled by the person to aid the prostitution of an individual"). A reasonable person operating with the same knowledge Officer Broen had at the time of the arrest, therefore, would have sufficient information to believe that Defendant had committed the felony of promotion of prostitution. Thus, this Court concludes that the June 20, 2007 arrest was supported by probable cause, and this ground provides no basis for suppression of evidence seized as a result of Defendant's arrest.

**B.     Probable Cause for the June 22, 2007 Arrest**

Defendant next contends that Bloomington police violated Minn. R. Crim. P. 6.01 when they arrested him on June 22, 2007, and that this unlawful arrest requires suppression of all evidence subsequently seized in their investigation. (Def.'s Mem. 9-10.)  This Court need not consider whether the officers violated Rule 6.01, which generally provides that police should issue a citation for misdemeanor offenses.  As the Government points out (Gov't's Resp. 12), for the purposes of determining whether evidence should be suppressed, the legality of the June 22, 2007 arrest is governed by federal, rather than state law.  "The Supreme Court has noted that [it] is a well-established principle of the common law that a police officer is permitted to arrest without a warrant if a misdemeanor is committed in the officer's presence."  *United States v. Lewis*, 183 F.3d 791, 794 (8th Cir. 1999).  Because there is no dispute here that Defendant committed a misdemeanor, reckless driving and driving with a suspended license, in the arresting officers' presence, his June 22, 2007 arrest was lawful.  *See id.* (rejecting an identical argument regarding Minn. R. Crim. P. 6.01 and state police officers' authority to arrest for a misdemeanor offense).

**C.     The Inventory Search of the Dodge Durango on June 20, 2007**

Defendant argues that the inventory search of the Dodge Durango he was driving at the time of his June 20, 2007 arrest was unlawfully conducted.  (Def.'s

Mem. 14-19; Def.'s Reply 5-6.)  "Law enforcement may search a lawfully[8]

impounded vehicle to compile an inventory list of the vehicle's contents without

violating the Fourth Amendment."  *United States v. Rowland*, 341 F.3d 774, 779

(8th Cir. 2003.)  Such inventory searches need not be supported by probable

cause or authorized by a search warrant because law-enforcement officials "are

not investigating a crime; instead they are 'performing an administrative or care-

taking function.'"  *Id.* (quoting *United States v. Marshall*, 986 F.2d 1171, 1174

(8th Cir. 1993)).  Such inventory searches are permitted without a warrant

because officers are legitimately protecting the property inventoried and seized

---

8       Here, Defendant argues that the Durango was not lawfully impounded because another potential driver was present who could have driven the car away—the female passenger who was in the vehicle when Bloomington police stopped it.  (Def.'s Reply 5-6.)  However, the Bloomington Police Department impoundment policy submitted by the Government demonstrates that the towing of the Durango complied with the Department's established procedures.  That policy allows for impoundment when the vehicle's "owner or driver . . . is arrested" and gives the officer discretion to (but does not require that she) release the vehicle to a "responsible person at the scene if the owner wants and authorizes the person to take the vehicle and the vehicle or contents are not needed for evidence."  (Doc. No. 50, Attach. 1, Patrol Procedure: 306 ("Patrol Procedure: 306") at 1-2.)  Even if Defendant had indicated that he wanted the female passenger to drive the Durango away from the scene, he could not have authorized her to do this under the Bloomington Police Department's impoundment policy because he was not the owner of the vehicle; the Durango was a rental vehicle.  (*See* Tr. 31-32.)

        This same analysis applies to the impoundment of the rental vehicle Defendant was driving on June 22, 2007, when he was stopped and arrested in Burnsville.  (*See* Tr. 51-53.)  Defendant argues that the impoundment and inventory search of this vehicle was also unlawful, but the record before this Court contains no information regarding the circumstances of the impoundment and inventory search of this vehicle that would justify suppression of any evidence seized as a result.

while the person remains in custody and protecting themselves and their departments from claims of lost or damaged property. *See South Dakota v. Opperman*, 428 U.S. 364, 369 (1976); *Rowland*, 341 F.3d at 779 (citing *Opperman*, 428 U.S. at 369). Such searches also respond to the need to protect the police from potential danger. *United States v. Hall*, 497 F.3d 846, 850 (8th Cir. 2007) (citing *Opperman*, 428 U.S. at 369). "The only limit on such searches is that they must be reasonable under the circumstances." *Rowland*, 341 F.3d at 779 (citing *Opperman*, 428 U.S. at 369).

"Inventory searches that are conducted according to standardized police procedures are reasonable." *Hall*, 497 F.3d at 1143 (internal quotations omitted). "Standardized police procedures are necessary to ensure that the search is not merely a ruse for general rummaging in order to discover incriminating evidence." *Id.* However, even if law enforcement "fails to conduct a search according to standardized procedures, this does not mandate the suppression of the evidence discovered as a result of the search." *Rowland*, 341 F.3d at 780 (citing *United States v. Mayfield*, 161 F.3d 1143, 1145 (8th Cir. 1998)). "[P]olice may keep their eyes open for potentially incriminating items that they might discover in the course of an inventory search, as long as their sole purpose is not to investigate a crime." *Hall*, 497 F.3d at 851. While law-enforcement's compliance with standard procedures only helps ensure that the search carries out "'the government's care-taking function,'" *see Rowland,* 341 F.3d at 780 (quoting *Mayfield*, 161 F.3d at 1145), to warrant suppression, there must be "something to

suggest the police raised 'the inventory-search banner in an after-the-fact attempt to justify' a simple investigatory search for incriminating evidence." *Id.* (quoting *Marshall*, 986 F.2d at 1175).

Defendant argues that the search of the Durango was not a proper inventory search, asserting that law enforcement's only purpose in conducting the search was to gather evidence of the suspected crime. The record before the Court raises a strong inference that Officer Broen's primary motivation for directing the search of the Durango was to discover evidence that Defendant was promoting prostitution. Officer Broen testified as follows:

> Q. The items that are listed as having been found in the vehicle are limited to items which, according to your report, are somehow connected to prostitution business; fair to say?
>
> A. Correct.
>
> Q. Those are the items that you were hoping to find in the search; true?
>
> A. Be a bonus. Yes.
>
> Q. Those are the items you looked for while you're searching the car; true?
>
> A. I actually didn't conduct the search. *I told Detective Bitney what [Defendant] was arrested for, and instructed him to do an inventory search and take anything that was useful*.

(Tr. 32 (emphasis added).) The inventory form attached to this Report and Recommendation as Appendix A confirms that the items listed were related to the suspected crime. As in *Rowland*, this evidence of motive, "combined with

what the police chose to record or not to record concerns us." *See Rowland*, 341

F.3d at 780.

The Government asserts, however, that "it makes no difference whether

Investigator Broen . . . thought the car might contain incriminating evidence"

because the search was conducted pursuant to the Bloomington Police

Department's inventory policy. (Gov't's Resp. 15.) According to the Bloomington

Police impoundment and inventory policy for vehicles:

> An inventory search shall be conducted on all impounded vehicles to
> locate, identify, and inventory items of more than $50 value that
> come under the Bloomington Police Department's control. Personal
> property of an estimated $300 value not permanently affixed in a
> vehicle shall be inventoried and placed in the Police Property Room.

> The scope of an inventory search shall include any areas within the
> vehicle where personal property or dangerous items could
> reasonably located including, but not limited to: the passenger
> compartment, glove compartments, consoles, trunk, and any closed,
> locked, or sealed containers whose contents cannot be readily
> determined by examining the container's exterior.

(Patrol Procedure: 306 ¶ II.B.) Thus, Officer Bitney was under an obligation to

conduct an inventory of the Durango, and in that inventory they were required to

record items worth more than 50 dollars. There was no evidence that there were

any items worth more than 50 dollars found in the vehicle that were not listed on

the inventory form. Although he did not inventory any items worth over 50 dollars

other than, perhaps, a cellular phone and charger (*see* Appendix A at 2), it was

not a violation of the policy for Bitney to list any other items worth less than 50

dollars.  In other words, the policy contains no prohibition against the approach taken here.

It appears that the officers here had a strong investigative purpose in searching the Durango, but followed their department's established procedures when they conducted the search.  Unlike the situation in *Rowland*, where officers failed to comply with their department's policy requiring them to inventory *all* property in an impounded vehicle, *see* 341 F.3d at 780, here Officer Bitney conducted the inventory search of the Durango without clearly transgressing the established procedures.  The Eighth Circuit has stated that inventory searches that comply with standardized procedures "are reasonable."  *Hall*, 497 F.3d at 851.  Thus, it appears that a finding that officers failed to comply with established procedures is a prerequisite to suppression, and no such finding is warranted here.  Further, even though Officer Broen told Bitney to take whatever was useful, if Bitney had decided not to conduct the inventory search to avoid proceeding under the specter of investigative purpose, he would have placed any property in the Durango in jeopardy of theft and exposed the police department to a risk of liability, thus failing to achieve either of the inventory exception's caretaking functions.  Instead, Officer Bitney conducted the inventory search according to the Bloomington Police Department's policy, and thus conducted a valid inventory search of the Durango.  Accordingly, to the extent it seeks suppression on the ground that the inventory of the Durango was unlawful, Defendant's motion for suppression should be denied.

### D. The Warrantless Search of Defendant's Wallet and Cell Phone During Booking on June 20, 2007

Defendant also argues that the searches of his wallet and his cell phone that took place during his booking on June 20, 2007, were unlawful and that all evidence seized as a result of these searches is inadmissible. (Def.'s Mem. 19-20.) The Government asserts that the search of these items was justified because they were obtained pursuant to the established post-arrest booking procedures of the Bloomington Police Department. (Gov't's Resp. 15; *see also id.*, Attach. 2, Gov't's Ex. 10, Administrative Procedure: 500 ("Booking Policy").)

When a suspect is brought to the stationhouse for booking and detention, law enforcement may remove and itemize all property found on the person or otherwise in his or her possession. *Illinois v. Lafayette*, 462 U.S. 640, 646 (1983). A key government interest supporting such inventory searches is the need to account for all property in an arrested person's possession to guard against theft or false claims as to what was taken by the police. *Id.*

> A warrantless inventory search is constitutionally permissible if (1) the individual whose possession is to be searched has been lawfully arrested . . . and (2) the search satisfies the fourth amendment standard of reasonableness, that is, it is conducted 'as part of the routine procedure incident to incarcerating an arrested person' and 'in accordance with established inventory procedures[.]

*United States v. Caves*, 890 F.2d 87, 93 (8th Cir. 1989) (quoting *Lafayette*, 462 U.S. at 648) (internal citations omitted). Reasonableness is the hallmark of a proper inventory search. *See Colorado v. Bertine*, 479 U.S. 367, 374 (1987)

(concluding that "reasonable police regulations relating to inventory procedures administered in good faith satisfy the Fourth Amendment").

### 1. Wallet

Several courts have determined that inventorying the contents of a wallet at a stationhouse without a warrant, but pursuant to established booking procedures, satisfies the inventory exception to the warrant requirement. *See United States v. Morris*, 166 F.3d 339, 1998 WL 912080, at *2 (5th Cir. 1998); *United States v. McCroy*, 102 F.3d 239 (6th Cir. 1996); *United States v. McEachern*, 675 F.2d 618, 622 n.6 (4th Cir. 1982); *United States v. Matthews*, 615 F.2d 1279, 1286 (10th Cir. 1980); *United States v. Gallop*, 606 F.2d 836, 839 (9th Cir. 1979). Here, Officer Broen testified that after Defendant was arrested and taken to the Bloomington jail, law-enforcement personnel took his wallet and inventoried it and its contents. He stated that the reasons for going through the wallet were to determine whether there was contraband in the wallet, to protect officer safety, for liability reasons, and to confirm the suspect's identity. He testified that Bloomington police inventoried the vast majority of the items in the wallet, excluding only items such as small pieces of paper. (Tr. 13-14.) He did not recall how many folds the wallet had in it, but admitted that he was interested in finding information to advance the investigation as well as conducting a thorough inventory of the wallet. (*See* Tr. 35.)

The Bloomington Police Department's policy for inventorying items found on the suspect's person states "[a]ll persons admitted to the municipal holding

facility shall be booked in accordance with the procedures outlined within the City of Bloomington Jail Operation Manual . . ., which include the following: . . . [a]ll persons shall be thoroughly searched for weapons, contraband and evidence of criminal conduct." (Booking Policy ¶ II.A.1.) Further, the policy provides that "[a]ll property except necessary clothing shall be taken from the person, inventories [sic] on the prisoner's booking report and placed in the prisoner's property bag or bin for safekeeping." (*Id.* at ¶ II.A.2.) The record reflects that Officer Broen and the Bloomington Police Department personnel conducting the inventory at the Bloomington jail administered these procedures while inventorying the contents of Defendant's wallet, and thus performed the caretaking function served by the inventory exception to the warrant requirement. For instance, their decision to record credit-card information served the caretaking function of an inventory search because credit cards are valuable property that must be safeguarded when an individual is arrested. Although Officer Broen testified that he was interested in finding evidence to further his investigation, there is no evidence that this inventory was conducted in bad faith. *See Bertine*, 479 U.S. at 374 (concluding that "reasonable police regulations relating to inventory procedures administered in good faith satisfy the Fourth Amendment").

For these reasons, this Court concludes that the Bloomington Police Department conducted a lawful inventory search of Defendant's wallet during the

booking process, and Defendant's motion to suppress should be denied to the extent it seeks suppression of the evidence seized from that search.

## 2. Cellular phone

The search of the cellular phone found on Defendant's person and inventoried at the Bloomington jail presents a closer question. While several courts have considered whether the search of a cellular phone is justified as incident to a lawful arrest,[9] the Government has not raised that exception to the warrant requirement to justify the search of Defendant's cellular phone in this

---

[9] Several courts, including one from this District, have concluded that officers may retrieve text messages and other information from cellular phones seized in a search incident to a lawful arrest. *See, e.g., United States v. Murphy*, 552 F.3d 405, 411 (4th Cir. 2009); *United States v. Finley*, 477 F.3d 250, 259-60 (5th Cir. 2007); *United States v. Wurie*, 612 F. Supp. 2d 104, 110 (D. Mass. 2009); *United States v. Santillan*, 571 F. Supp. 2d 1093, 1102-03 (D. Ariz. 2008); *United States v. Deans*, 549 F. Supp. 2d 1085, 1094 (D. Minn. 2008). Other courts have invalidated warrantless searches of cellular phones seized incident to arrest. *See, e.g., United States v. Quintana*, 594 F. Supp. 2d 1291, 1301 (M.D. Fla. 2009); *United States v. McGhee*, No. 8:09CR31, 2009 WL 2424104, at *3-4 (D. Neb. July 21, 2009); *United States v. Wall*, No. 08-60016-CR, 2008 WL 5381412, at *3 (S.D. Fla. Dec. 22, 2008); *United States v. Park*, No. CR 05-375 SI, 2007 WL 1521573, at * (N.D. Cal. May 23, 2007). Given the Supreme Court's conclusion in *Arizona v. Gant*, 129 S. Ct. 1710, 1721 (2009), that police may search a vehicle incident to arrest only when they have reason to believe that the arrestee could either access the vehicle and destroy evidence or that the vehicle contained evidence of the specific offense that was the subject of the arrest, it is possible that some of the decisions are now of limited persuasive value. Because the Government has not asserted that the search of the cellular phone at issue here was conducted incident to Defendant's arrest, this Court need not consider the extent of *Gant's* impact on these conflicting lines of case law.

matter.[10]  Few courts have addressed whether the search of a cellular phone can be conducted as part of an inventory search, but at least two of federal district courts that have considered this question have determined that the search of a cellular phone's contents is not a proper inventory search.  *United States v. Wall*, 2008 WL 5381412, at *4; *Park*, 2007 WL 1521573, at *10-12.  In *Wall*, the Southern District of Florida analyzed whether the inventory exception could justify the Government's warrantless search of a cellular phone's contents as follows:

> The purpose of an inventory search is to document all property in an arrested person's possession to protect property from theft and the police from lawsuits based on lost or stolen property.  This of course includes cell phones.  However, there is no need to document the phone numbers, photos, text messages, or other data stored in the memory of a cell phone to properly inventory the person's possessions because the threat of theft concerns the cell phone itself, not the electronic information stored on it.  Surely the Government cannot claim that a search of text messages on [the defendant's] cell phones was necessary to inventory the property in his possession.  Therefore, the search exceeded the scope of an inventory search and entered the territory of general rummaging.

2008 WL 5381412, at *4.  Similarly, the Northern District of California has observed that officers can achieve the legitimate purposes of an inventory search "simply by listing defendants' cell phones as items on the booking forms," and that unlike purses or bags, "which might contain contraband or weapons, there is

---

[10]  The Government also has not contested that viewing the information in Defendant's cellular phone was a "search" within the meaning of the Fourth Amendment.

no possibility that a cell phone will contain any dangerous instrumentalities."

*Park*, 2007 WL 1521573, at *11.

Here, Officer Broen and another officer looked through the recent call logs and through the recent text messages on the cellular phone taken from Defendant's person during the booking process. (Tr. 15.) The officers, however, were unable to look through all the recent numbers of incoming and outgoing calls and the recent text messages. (*Id.*) Officer Broen testified that he did not have a warrant to conduct this search, but it was his understanding that he could go through as much of the content of the phone as possible so long as the booking process was taking place.[11] (*Id.* at 15-16.) Officer Broen admitted that he was not looking through the cellular phone for the purpose of finding contraband, but instead was looking for information to further his investigation into Defendant's involvement in promoting prostitution. (*Id.* at 34-45.)

There is no evidence that Officer Broen was searching through the data stored on the phone, including its memory of the phone numbers of ingoing and outgoing calls and the content of its recent text messages, to confirm Defendant's identity, to protect Defendant's property from theft or the Bloomington Police Department from a lawsuit, to ensure the safety of officers, or

---

[11] Officer Broen stated that he thought he had such authority both as a part of a search incident to arrest and as a part of the booking process (Tr. 16), but as noted, *supra*, at p. 31-32 & n.9, the Government has not raised the search-incident-to-arrest exception to justify the inventory search of Defendant's cellular phone conducted during his June 20, 2007 booking.

because he had reason to believe that evidence on the phone would be destroyed. Rather, it is clear that Officer Broen's only motivation in reviewing the contents of the phone was to gather as much information for his investigation as possible without first obtaining a warrant. *See Park*, 2007 WL 1521573, at *11 (concluding that an officer's "rote recitation of other legitimate purposes of a booking search" did not apply to a cellular-phone search).

Therefore, this Court finds that the search of the cellular phone seized from Defendant's person and conducted during his June 20, 2007 booking was nothing more than a general rummaging and the asserted inventory justification for that warrantless search is a pretext. For this reason, this Court concludes that the Bloomington Police Department violated Defendant's Fourth Amendment rights by searching the contents of his cellular phone during his June 20, 2007 booking. However, as discussed below, the information obtained from that unlawful search of the cellular phone taken from Defendant's person would have been discovered as a result of the search warrant later issued for that phone, and, therefore, suppression of this information is not required.

### E. Derivative Evidence

Defendant next argues that all the evidence seized in the investigation following the unlawful search of his cellular phone during his June 20, 2007 booking, including the evidence seized pursuant to various search warrants supported by affidavits that used information obtained in that search, must be suppressed. (*See* Def's Reply 6-7; *cf.* Def.'s Mem. 21 (arguing under a heading

regarding alleged falsities in various affidavits that subsequent affidavits relied on information obtained through prior illegal searches).)

"Exclusion of derivative evidence is not justified where a warrant was secured by information from an independent source." *United States v. Robinson*, 441 F. Supp. 2d 1029, 1036 (D. Minn. 2006) (citing *Segura v. United States*, 468 U.S. 796, 814 (1984)). "[W]hen a search warrant is based partially on tainted evidence and partially arising from independent sources, 'if lawfully obtained information amounts to probable cause and would have justified issuance of the warrant apart from the tainted information, the evidence seized pursuant to the warrant is admitted.'" *United States v. Williams*, 633 F.2d 742, 745 (8th Cir. 1980) (quoting *James v. United States*, 418 F.2d 1150, 1152 (D.C. Cir. 1969), and citing "[n]umerous courts" that have followed this rule) (alteration in original omitted). What this means is that when the tainted information is removed from the affidavit, courts consider whether the purged affidavit establishes probable cause in its untainted state.

However, a showing of independent probable cause alone is insufficient, and the prosecution must also show that the illegally obtained evidence did not affect its motivation to request a search warrant. *See United States v. Leveringston*, 397 F.3d 1112, 1115 (8th Cir. 2005). "'[F]indings of fact by the district court are required' and the 'prosecution should present specific evidence that the officers were not prompted by allegedly unlawful activity to obtain the warrant[.]'" *Robinson*, 441 F. Supp. 2d at 1036 (quoting *Leveringston*, 397 F.3d

35

at 1115).  Courts must consider "whether the officers would have applied for the search warrants if they did not have the benefit of the illegally obtained information."  *Id.* (citing *United States v. Estrada*, 45 F.3d 1215, 1221 (8th Cir. 1995)).  However, it is appropriate to consider circumstantial evidence in determining the motivation of officers in seeking a search warrant and testimony from police officers regarding such motivation is not required to satisfy the motivation prong.  *See id.* at 1036 n.4 (citing *Estrada*, 45 F.3d at 1221).  Thus, "[t]o uphold a warrant on independent information, the prosecution must satisfy two separate inquiries: (1) the decision to seek the warrant must not have been prompted by what was learned from the illegal conduct; and (2) illegally obtained information must not have affected the magistrate judge's decision to issue a warrant."  *Id.* at 1036 (citing *Murray v. United States*, 487 U.S. 533, 542 (1988)).

### 1.    Parkwood drive search warrant

As mentioned above, on June 21, 2007, Sergeant Smith applied for and obtained a search warrant for an address on Parkwood Drive in Burnsville. (Gov't Ex. 1.)  The affidavit supporting this search warrant includes information obtained during the illegal search of Defendant's cellular phone during his June 20, 2007 booking.  This information includes the following: (1) that officers saw contact information for an individual named Suzanne Oliver who was known to be engaged in prostitution and promoting prostitution; and (2) that Oliver sent Defendant a message "shortly after his arrest stating that someone was at the

house to fix the garage and the girls were on their way there." (Gov't's Ex. 1 at 2.)

If these tainted pieces of information are removed from the affidavit, this Court finds that there is still probable cause for the warrant based on untainted information in the affidavit. This untainted information ties Defendant to the suspected crime of promoting prostitution by discussing his connection to other individuals involved in the promotion of prostitution, his connection to the Parkwood Drive address, the observations his actions made by hotel employees at the Homewood Suites, the results of Officer Broen's surveillance at the Homewood Suites, statements Defendant volunteered during his booking, and comments made by the female passenger after the Durango was stopped. Further, this Court finds that there is no evidence to suggest that the decision to seek the warrant was prompted by the information illegally obtained in the search of the cellular phone. The presence of the untainted information and the officers' ongoing investigation of Defendant's involvement in the promotion of prostitution suggest that they would have sought the search warrant for the Parkwood Drive address even if the unlawful search of the cellular phone had not occurred. For these reasons, this Court concludes that the evidence seized as a result of the execution of the search warrant at the Parkwood Drive address need not be suppressed as evidence derivative of the unlawful search of Defendant's cellular phone during his June 20, 2007 booking.

### 2. City Pages search warrant

On July 30, 2007, Officer Broen applied for and obtained a search warrant for information relating to Defendant's connection to the City Pages Newspaper and advertisements placed in that newspaper and on its website. (Gov't Ex. 3.) Nothing in this affidavit refers to information learned from the unlawful search of Defendant's cellular phone, and, therefore, this Court finds that no evidence seized as a result of this search warrant's execution need be suppressed.

### 3. Search warrants for three bank accounts

On June 22, 2007, Officer Broen applied for and obtained three search warrants for information relating to bank accounts connected to Defendant. (Gov't Exs. 4-6.) In each of the affidavits supporting the applications for the search warrants, Officer Broen included information obtained in the unlawful inventory search of Defendant's cellular phone. Each affidavit contained the following identical language:

> Officers also checked Chappell's cellular phone for recent calls and messages. Officers found Suzanne Miller in the phone and a text message from "Suze" to Chappell shortly after his arrest stating that someone was at the house to fix the garage and "Ravi and the girls were on their way there." Sgt. Smith knew from his surveillance at the home in Burnsville that someone had in fact been at the home working on the garage door. Ravael Nelson was one of the registered guests at the Homewood suites where there were complaints of prostitution activity.

(Gov't Exs. 4-6 at 2-3.)

This Court concludes that these affidavits contained sufficient untainted information to establish probable cause for the same reasons stated in

connection with the Parkwood Drive warrant. In addition, other facts creating a reasonable probability that a review of the bank records would reveal evidence include untainted information connecting Defendant to others promoting prostitution, establishing that he rented a hotel room for prostitutes' use, and connecting him to several websites on which officers believed individuals were soliciting prostitution. Further, there is no evidence to suggest that that the decision to seek the warrant was prompted by the information illegally obtained in the unlawful search of the cellular phone. For these reasons, this Court concludes that the evidence seized as a result of the execution of the search warrants for the corresponding bank accounts need not be suppressed as evidence derivative of an unlawful search.

### 4. Cellular phone search warrants

On June 26, 2007, Officer Broen applied for and obtained two search warrants to examine the contents of five different cellular telephones. (Gov't's Exs. 7-8.) The first of these search warrants concerns three cellular phones that were taken from Defendant when he was arrested on June 22, 2007, shortly after his release from jail following his June 20, 2007 arrest. (Gov't's Ex. 7.) The second concerns the two cellular phones taken from Defendant at the time of his June 20, 2007 arrest, including one phone taken from the vehicle and the phone taken from his person and searched during his booking. The affidavit supporting the applications for these search warrants include information tainted by the

unlawful search of Defendant's phone during his June 20, 2007 booking.  Each

affidavit states:

> When Chappell was arrested [on June 20, 2007] he had a cellular
> phone on his person.  This cellular phone is described above as the
> phone bearing IMEI#XXXXXXXXXXXXXXXX.  . . . Detective Peterson
> checked the phone that Chappell had on his person for recent calls
> and messages while Chappell was being booked.  The number for
> Chappell's phone that was on his person was XXX-XXX-XXXX.
> Officers found "Suz" in the phone and a text message from "Suz" to
> Chappell shortly after his arrest stating that someone was at the
> house to fix the garage and "Ravi and the girls were on their way
> here."  Suzanne Marie Oliver has also been identified as another
> suspect that has been working with Chappell in the promotion of
> prostitution. . . . Ravael Nelson was one of the registered guests at
> the Homewood suites where there were complaints of prostitution
> activity, and "Ravi" appears to be a nickname for Ravael Nelson.

(Gov't Exs. 7 & 8 at 2.)

These affidavits also contain untainted information about Officer Broen's

training and experience in the investigation of narcotics and vice-related

offenses.  The affidavits further state the circumstances in which the officers

seized the telephones.  Officer Broen asserts his belief that a search of the

cellular phones' contents would reveal further evidence of Defendant's

involvement in the promotion of prostitution.  He further states that from his

previous experience and training, "prostitutes as well as the people they are

working for often times communicate about their illicit activities via their cellular

phones.  Appointment times and other information can also be held in these

cellular phones."  (Gov't Ex. 7 at 3; Gov't Ex. 8 at 2.)

This Court finds that the untainted information presented in these affidavits is sufficient to establish probable cause and that there is no evidence to suggest that the decision to seek these warrants was prompted by the information illegally obtained in the search of the cellular phone taken from Defendant's person during his June 20, 2007 booking. For these reasons, this Court concludes that the evidence seized as a result of the execution of the search warrants for the cellular phones need not be suppressed.[12]

### 5. Taylor Street Search Warrant

As noted above, on July 2, 2007, Officer Broen applied for and obtained a search warrant for a Taylor Street address in Minneapolis. (Gov't Ex. 2.) The

---

[12] Under the inevitable-discovery doctrine, this Court alternatively concludes that it is more probable than not that the evidence gathered during the unlawful search of Defendant's cellular phone that took place while he was being booked on June 20, 2007, would have ultimately been (and, in fact, was) discovered by the execution of the search warrant the investigating officers eventually obtained. *See United States v. Johnson*, 528 F.3d 575, 580 (8th Cir. 2008) (citing *Nix v. Williams*, 467 U.S. 431, 444 (1984), and *United States v. Thomas*, 524 F.3d 855, 859 (8th Cir. 2008) (Colloton, J., concurring)). To prevail under the inevitable-discovery exception to the exclusionary rule, "the government must establish '(1) that there was a reasonable probability that the evidence would have been discovered by lawful means in the absence of police misconduct, and (2) that the government was actively pursuing a substantial, alternative line of investigation at the time of the constitutional violation.'" *United States v. Pruneda*, 518 F.3d 597, 604 (8th Cir. 2008) (quoting *United States v. Conner*, 127 F.3d 663, 667 (8th Cir. 1997)). Here, it is reasonably probable that the officers would have learned what was on the cellular phone if they had never looked at its contents during the June 20, 2007 booking. Their application for the search warrant for this phone provided sufficient probable cause even when the tainted information is excised from the supporting affidavit. The officers were pursuing other substantial investigative alternatives at the time of the unlawful search of the phone, including their surveillance of Defendant and his lawful arrest.

only arguably tainted evidence in the affidavit supporting the application for this search warrant includes the following assertions:

> Officers also checked Chappell's cellular phone for recent calls and messages. Officers found Suzanne Miller in the phone and a text message from "Suz" to Chappell shortly after his arrest stating that someone was at the house to fix the garage and "Ravi and the girls were on their way there." Sgt. Smith knew from his surveillance at the home in Burnsville that someone had in fact been at the home working on the garage door. Ravael Nelson was one of the registered guests at the Homewood suites where there were complaints of prostitution activity.

(Gov't's Ex. 2 at 3.) This evidence was gathered in the unlawful search of the cellular phone taken from Defendant's person during his June 20, 2007 booking. However, by the time that Officer Broen applied for the Taylor Street warrant on July 2, 2009, he had already executed a search warrant for that phone on June 26, 2007. As discussed above, the search warrant for that phone was sufficiently supported by probable cause. *See* discussion, *supra*, section II.E.4. Thus, using lawful means, the officers learned whatever information was on that phone prior to the application for Taylor Street search warrant, and the quoted assertions from Officer Broen's affidavit need not be excised from the warrant.

Even if those statements were removed from the affidavit, however, it would still provide probable cause for the search of the premises described. The affidavit includes all the information described above in connection with the other warrants that created a reasonable belief that Defendant was engaged in the promotion of prostitution. The affidavit further explains that the female passenger in the Durango on June 20, 2007 admitted that she was working as a prostitute

for Defendant.  (Gov't's Ex. 2 at 3.)  It also explains that in the search of the Durango, officers found notes and bills linking Defendant to the Taylor Street location, and officers confirmed Defendant's connection to the premises through checking Hennepin County tax records.  Further, the affidavit states that when Defendant bailed out of jail after his arrest on June 22, 2007, he and the female who posted his bail left in a vehicle that Sergeant Smith later observed at the Taylor Street address.  For these reasons, this Court concludes that the warrant is supported by sufficient probable cause.  And there is no evidence that any tainted information motivated law enforcement to seek this warrant.  Accordingly, the evidence seized pursuant to the warrant need not be suppressed.

### F.  The Validity of the Search Warrants under *Franks v. Delaware*

Finally, Defendant argues that the evidence seized pursuant to various search warrants should be suppressed under *Franks v. Delaware*, 438 U.S. 154 (1978), on the ground that the warrants were obtained with supporting affidavits that contained false statements and material omissions.  "Under *Franks* and its progeny, a defendant may challenge a search warrant on the grounds that the probable cause determination relied on an affidavit containing false statements or omissions made knowingly and intentionally or with reckless disregard for the truth."  *United States v. Snyder*, 511 F.3d 813, 816 (8th Cir. 2008) (citing *Franks*, 438 U.S. at 171; *United States v. Reinholz*, 245 F.3d 765, 774 (8th Cir. 2001)).  To prevail on a challenge to a warrant affidavit under *Franks*, a defendant must make a substantial preliminary showing that: (1) a false statement, or omission,

knowingly and intentionally, or with reckless disregard for the truth, was included

by the affiant in the affidavit, and (2) the allegedly false statement, or omission, is

necessary to the finding of probable cause.  *Franks*, 438 U.S. at 171; *United*

*States v. Humphreys*, 982 F.2d 254, 258 n. 2 (8th Cir. 1992) (citing *United States*

*v. Lueth*, 807 F.2d 719, 726 (8th Cir. 1986)).  Allegations of deliberate falsehood

or reckless disregard must be accompanied by an offer of proof.  *Franks*, 438

U.S. at 156.  A negligent mistake does not rise to the level of a *Franks* violation.

*United States v. Gladney*, 48 F.3d 309, 313 (8th Cir. 1995).  To determine

whether an affiant had a reckless disregard for the truth, courts look to whether

the affiant "in fact entertained serious doubts as to the truth of the affidavits or

had obvious reasons to doubt the accuracy of the information contained therein."

*United States v. Clapp*, 46 F.3d 795, 800 (8th Cir. 1995) (citing *United States v.*

*Dorfman*, 542 F.Supp. 345, 369 (N.D. Ill. 1982)).

Defendant contends that the application for the search warrant issued on

June 21, 2007, for the Parkwood Drive address in Burnsville (Gov't's Ex. 1),

included the false statement that at the time of his booking Defendant told the

booking officers that his residence was the Parkwood Drive address.  (Def.'s

Mem. 22.)  Defendant asserts that this statement was false because the

videotaped interview of Defendant (Interview DVD) clearly shows that Defendant

provided officers with an address in Paradise, Texas.[13] (*Id.*) This argument, however, ignores the fact that Defendant's reference to a Paradise, Texas, address during a June 22, 2007 interview says nothing about what information he provided police about his residence or some other address during his booking two days earlier on June 20, 2007. Defendant has, therefore, not met the rigorous standard for establishing that the affidavit in support of this search warrant contained falsehoods or material omissions.

Defendant also appears to argue that there was a material omission in the affidavit supporting the application for the Taylor Street warrant (Gov't's Ex. 2), because Officer Broen did not explain that officers had sought a warrant less than two weeks before claiming that Defendant's address was located on Parkwood Drive in Burnsville. (*See* Def.'s Mem. 6.) In addition, Defendant asserts that Officer Broen omitted information he had learned about Defendant's connection with a Paradise, Texas, address during his investigation. (Def.'s Mem. 6-7.)

---

[13] In his post-hearing memorandum, Defendant also asserts that Defendant's booking sheet lists a Paradise, Texas, address for Defendant's residence. (Def.'s Mem. 22.) However, this assertion is not accompanied by any evidentiary proof. The only evidence regarding a police report with a Paradise, Texas, address is the testimony of Sergeant Smith that his June 22, 2007 report mentioned that location as Defendant's address. (Tr. 55.) Because this report was prepared in connection with Defendant's arrest one day after the application for the Parkwood Drive search warrant was completed, it was not information that the officers seeking the June 21, 2007 search warrant knew and omitted.

The Taylor Street affidavit does not specifically mention that officers represented that the Parkwood Drive address was Defendant's residence in pursuing the Parkwood Drive search warrant. However, this is not an intentional omission of material, truthful information because law-enforcement officers had reason to believe that Defendant maintained multiple residences. (*See* Tr. 55.) There is no evidence to support Defendant's contention (*see* Def.'s Reply 7-8), that the officers were attempting to mislead the reviewing judges into thinking that Defendant had only one address. In fact, the Taylor Street affidavit includes information that the officers obtained a warrant to search the Parkwood Drive address because of its connection to Defendant and one of his suspected accomplices and that Defendant's driver's license included the Parkwood Drive address in connection with a previous promotion-of-prostitution conviction. (Gov't's Ex. 2 at 2.) This information does not support a claim that the officers were attempting to mislead the judge reviewing their application for either warrant.

For these reasons, this Court concludes that Defendant has failed to demonstrate that there was a *Franks* violation in connection with any of the search warrants in this matter, and his argument accordingly presents no grounds for suppression.

## III.  Motion to Suppress Statements

Defendant has also filed a Motion to Suppress Statements, Admissions, and Answers (Doc. No. 29).  Defendant argues that the interrogation of

Defendant that took place on June 22, 2007, was conducted following his unlawful arrest two days before, but he makes no other argument regarding the basis for suppression of any statements. Because this Court has already concluded that the June 20, 2007 arrest was supported by probable cause, this Court rejects Defendant's argument.

Further, this Court has reviewed the evidence regarding the law-enforcement officials' questioning of Defendant on June 22, 2007 (Interview DVD), and determines that Defendant was adequately advised of his rights prior to the custodial interrogation that took place, and nothing about that questioning indicates that the statements Defendant made were involuntarily obtained or were the product of an overborne will. Therefore, this Court recommends that Defendant's motion to suppress statements be denied.

## RECOMMENDATION

**IT IS HERERBY RECOMMENDED** that:

1.      Defendant's Motion to Dismiss Indictment for Failure to State an Offense (Doc. No. 23), and Defendant's *Pro Se* Motion to Dismiss (Doc. No. 3), be **DENIED**;

2.      Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure (Doc. No. 28), be **DENIED**; and

3.      Defendant's Motion to Suppress Statements, Admissions, and Answers (Doc. No. 29), be **DENIED**.

Date: January 12, 2010

s/Jeffrey J. Keyes
JEFFREY J. KEYES
United States Magistrate Judge

Under D. Minn. LR 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **January 26, 2010**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections. Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals. A party may respond to the objecting party's brief within 14 days after service thereof. All briefs filed under this rule shall be limited to 3500 words. A judge shall make a de novo determination of those portions of the Report to which objection is made. This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable directly to the Circuit Court of Appeals.

Unless the parties stipulate that the District Court is not required by 28 U.S.C. § 636 to review a transcript of the hearing in order to resolve all objections made to this Report and Recommendation, the party making the objections shall timely order and file a complete transcript of the hearing within ten days of receipt of the Report.

---

**APPENDIX A**

City of Bloomington, Minnesota
POLICE DEPARTMENT

# PROPERTY RECEIPT

**Report Made**

☑ Offense   ☐ Information   ☐ Other   ☐ None

☑ Evidence   ☐ Recovered Goods
☐ Found Property   ☐ Other _____

Received/Recovered At: B.P.D. - DODGE DURANGO

Reported On
Month: 6   Day: 20   Year: 07   Time: 1640

By (Last, First, Middle Names) #231 / #215

Address B.P.D.

Phone (H)
Phone (W)

Name of Owner

Address

Phone (H)
Phone (W)

Defendant(s) CHAPPELL, ARTHUR JAMES

Offense Classifications PROMOTING PROSTITUTION

| Tag No. | Control No. Office Use Only | Description of Property | Value |
|---|---|---|---|
| 073306 | | 1. (12) PRINTOUT'S OF CRAIGLIST EROTIC SERVICE ADS | |
| 073307 | | 2. (4) HOMESTEAD SUITES BILL FOR ROOM #314 | |
| 073308 | | 3. (1) COUNTRY INN & SUITES ROOM KEY | |
| 073309 | | 4. (1) HOMESTEAD SUITES NOTE PAD PAPER W/ MULTIPLE NAMES & PH NUMBERS ON IT | |
| 073310 | | 5. (1) SALES RECEIPT FROM SHOES EVERYONE WEARS W/ THE NAME ARTHUR CHAPPELL | |
| 073311 | | 6. (3) PRINTOUT'S OF CRAIGLIST EROTIC SERVICE ADS (5) PRINTOUT'S OF CRAIGS | |
| | | 7. EROTIC SERVICE ADS | |
| 073312 | | 8. (1) US BANK DEPOSIT STUB FROM HENLY RAID Co. LLC TO RICHARD PERRY FOR $1,283.60 | $1,283.60 |
| 073313 | | 9. (1) COUNTRY INN & SUITES ROOM KEY | |
| 073314 | | 10. (1) US BANK COUNTER DEPOSIT SLIP W/ ARTHUR CHAPPELL'S NAME FOR $1283.6 | |
| 073315 | | 10. (1) COUNTRY INN & SUITES BILL FOR ROOM #323 | |

## Chain of Possession

| Items | Date | Time | Place | From | To/Claimant* |
|---|---|---|---|---|---|
| 1-10 | 6/20/07 | 1890 | B.P.D. | #231 | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

*TE: My signature above certifies that I have received the listed property and that I am the lawful owner or claimant.

**DISTRIBUTION:** White and Yellow with Property, Pink with Report

**STATEMENT OF NONDISCRIMINATION:** The City of Bloomington does not discriminate on the basis of disability.

City of Bloomington, Minnesota
POLICE DEPARTMENT

# PROPERTY RECEIPT

| Report Number | 2007-006762 | Sector | Page 52 of 52 |

## Report Made

☑ Offense  ☐ Information  ☐ Other  ☐ None

☑ Evidence  ☐ Recovered Goods
☐ Found Property  ☐ Other _____

| Received/Recovered At: | B.P.D. - Dibble Durango - | | |
| By (Last, First, Middle Names): #231 / #215 | Address: B.P.D. | Phone (H): Phone (W): | |
| Name of Owner | Address | Phone (H): Phone (W): | |

**Reported On**  Month: 6  Day: 20  Year: 07  Time: 1640

| Defendant(s) CHAPPELL, ARTHUR JAMES | ▓▓▓▓▓ | Offense Classifications PROMOTING PROSTITUTION |

| Tag No. | Control No. Office Use Only | Description of Property | Value |
|---|---|---|---|
| A13321 | | 1. MISC PAPERWORK, Box MARROW CONTAINS, CELL PH. CHARGER HI PERSONAL | |
| ↓ | | 2. CELL PHONE SILVER IN COLOR | |
| | | 3. | |
| | | 4. | |
| | | 5. | |
| | | 6. | |
| | | 7. | |
| | | 8. | |
| | | 9. | |
| | | 10. | |

## Chain of Possession

| Items | Date | Time | Place | From | To/Claimant* |
|---|---|---|---|---|---|
| 1 | 6/20/07 | 1800 | B.P.D. | #231 / #215 | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

NOTE: My signature above certifies that I have received the listed property and that I am the lawful owner or claimant.

DISTRIBUTION: White and Yellow with Property, Pink with Report

STATEMENT OF NONDISCRIMINATION: The City of Bloomington does not discriminate on the basis of disability.